# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Wayne B. Holstad and Northwest Title Agency, Inc., <br><br> Petitioners, <br><br> v. <br><br> U.S. Department of Labor, <br><br> Respondent. | Case No. 20-cv-1867 (SRN/ECW) <br><br><br> **MEMORANDUM OPINION AND ORDER** |

Frederic W. Knaak, Holstad & Knaak PLC, 4501 Allendale Drive, St. Paul, MN 55127, for Petitioner Wayne B. Holstad.

Wayne B. Holstad, Holstad & Knaak PLC, 4501 Allendale Drive, St. Paul, MN 55127, for Petitioner Northwest Title Agency, Inc.

Sarah J. Starrett, Office of the Solicitor, U.S. Department of Labor, 200 Constitution Ave. NW, Suite N2716, Washington D.C. 20210, for Respondent.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Petitioners Wayne B. Holstad ("Mr. Holstad") and Northwest Title Agency, Inc.'s ("Northwest Title") Petition for Review ("Petition") [Doc. No. 1] and Respondent U.S. Department of Labor's ("DOL") Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. No. 14]. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **DENIES** the Petition, **DENIES** Respondent's Motion to Dismiss, and **GRANTS** Respondent's Motion for Summary Judgment.

## I.    BACKGROUND

### A.    Statutory and Regulatory Background

This case centers on the McNamara-O'Hara Service Contract Act, 41 U.S.C. § 6701 *et seq.* ("SCA" or "Act"), and its implementing regulations. The SCA generally requires that all service contracts with the United States for amounts exceeding $2,500 include certain protections for the contractor's employees. *See* 41 U.S.C. §§ 6702-03. As relevant here, it requires contracts to contain provisions specifying the minimum wages and fringe benefits to be paid to each class of service employee. *Id.* § 6703(1) (minimum wages); *id.* § 6703(2) (fringe benefits). A contractor may satisfy its obligation to provide fringe benefits by paying, "in addition to the monetary wage required, a cash amount per hour in lieu of the specified fringe benefits, provided such amount is equivalent to the cost of the fringe benefits required." 29 C.F.R. § 4.177(c)(1); *see* 41 U.S.C. § 6703(2) (providing that the obligation to provide fringe benefits may be satisfied "by furnishing any equivalent combinations of fringe benefits or by making equivalent or differential payments in cash under regulations established by the Secretary").

Contractors must provide fringe benefits "separate from and in addition to the specified monetary wages." 29 C.F.R. § 4.170(a). Further, "[a]n employer cannot offset an amount of monetary wages paid in excess of the wages required under the [wage] determination in order to satisfy his fringe benefit obligations under the Act, and must keep appropriate records separately showing amounts paid for wages and amounts paid for fringe benefits." *Id.* The SCA also requires contractors to deliver notice to their employees

of the minimum wage and fringe benefits owed to them, or to post such notice at a prominent place at the worksite. 41 U.S.C. § 6703(4); 29 C.F.R. § 4.6(e).

Further, contractors must provide employees the minimum compensation required under the SCA for "each hour worked in performance of a covered contract." 29 C.F.R. § 4.178. A contractor will be liable for any underpayment of compensation due to any employee pursuant to the SCA. 41 U.S.C. § 6705(a)-(b). And under the SCA, liability extends to any "party responsible," which includes corporate officers "who actively direct[] and supervise[] the contract performance" and "corporate officers who control, or are responsible for control of, the corporate entity, as they, individually, have an obligation to assure compliance with the requirements of the Act, the regulations, and the contracts." 29 C.F.R. § 4.187(e)(1)-(2); *accord* 41 U.S.C. § 6705(a). In general, contractors that have been found to violate the SCA are barred from being awarded a federal government contract for three years. 41 U.S.C. § 6706.

### B.    Factual Background

Northwest Title is an insurance title firm that performs title searches and settlement services. (Pet. for Review [Doc. No. 1] at 3 ("ARB Decision").) In 2006, Mr. Holstad purchased Northwest Title, and he has held many positions at the firm, including Chief Executive Officer, President, and Chairman. (*Id.*) He is also its sole shareholder. (*Id.*) Mr. Holstad's brother, Joel Holstad, served as the firm's Chief Operating Officer and Chief Financial Officer in 2011 and 2012. (*Id.*)

On or around April 12, 2010, the U.S. Department of Housing and Urban Development ("HUD") awarded a contract to Northwest Title to "provide real estate

property sales closing services" for certain properties owned by HUD. (*Id.*) The contract—in effect from April 19, 2010 through April 21, 2012—provided that it was subject to the SCA and its implementing regulations. (*Id.*) It also incorporated SCA Wage Determination 2005-2287, Revision 8, which detailed the minimum wages and fringe benefits owed to each employee who performed work under the contract. (*Id.*) This provision required Northwest Title to provide three fringe benefits in addition to the required hourly wage: (1) health and welfare benefits of $3.35 per hour; (2) certain paid vacation benefits that depended on length of service; and (3) certain paid holiday benefits. (*Id.*) In March 2011, this provision was updated, raising the hourly wage and increasing the health and welfare benefit to $3.50 per hour. (*Id.*)

In April 2012, Valerie Jacobson, an investigator within the DOL's Wage and Hour Division ("WHD"), began investigating Northwest Title's compliance with the SCA. (*Id.*) The investigation revealed violations of the SCA and its regulations, including Northwest Title's failure: (1) to pay required back wages; (2) to pay health and welfare benefits, or cash payments in lieu of such benefits; and (3) to keep and provide adequate records of wages, benefits, and hours worked. (*Id.* at 4.) She calculated that Northwest Title owed $70,243.04 in health and welfare benefits to ten employees for the period from May 15, 2010 to May 5, 2012, but this amount was later corrected to $67,893.78. (*Id.*)

### C.   Proceedings Before the Administrative Law Judge

On July 29, 2014, the Administrator of the WHD filed an administrative complaint against Northwest Title, Mr. Holstad, and Joel Holstad. (Aff. of Sarah Starrett ("Starrett

Aff.") [Doc. No. 18-10] at 18.)[1] On July 18, 2016, Joel Holstad—in his individual capacity—entered into a settlement agreement with the Administrator, wherein he agreed to pay $40,000, to be credited to the employees' unpaid back wages, and agreed to forego entering into contracts with the federal government for three years. (*Id.* at 20-21.) The settlement agreement disposed of all claims against Joel Holstad. (*Id.* at 21.)

On August 23 and 24, 2016, the ALJ conducted a hearing, and took testimony from Mr. Holstad, Joel Holstad, Ms. Jacobson, and two former employees of Northwest Title and received various exhibits. (*See id.* at 19-43.) Based on the evidence presented at the hearing, the ALJ made several findings of fact and conclusions of law that are relevant here: (1) Petitioners failed to pay required health and welfare benefits to ten employees; (2) Petitioners were not entitled to any offsets to the amount they owe; (3) the Administrator's claims were not barred by the statute of limitations; and (4) Mr. Holstad was personally liable for the amount owed.

First, the ALJ found that Petitioners had failed to pay required health and welfare benefits of $3.35 per hour during the first contract year and $3.50 per hour during the second year, resulting in a total of $67,893.78 owed to ten employees. (*Id.* at 45-51.) At the hearing, Mr. Holstad testified in defense that Northwest Title had a company policy of paying higher wages to those who declined fringe health and welfare benefits and hence made cash equivalent payments consistent with the law. (*Id.* at 46.) However, the ALJ

---

[1] For clarity, the Court will refer to the ECF page numbers when referencing the Administrative Law Judge's ("ALJ") decision. (*See id.* at 17-63 ("ALJ Decision").)

found more credible the testimony of Ms. Jacobson that there was no evidence of such a company policy and that Petitioners' payroll records did not show that any cash equivalent payments were made in lieu of providing health and welfare benefits. (*Id.* at 46-49.) Indeed, the ALJ noted that:

> none of the three Respondents offered into evidence any records other than those offered by Complainant and admitted in evidence. I must presume that if there were additional records showing that Northwest paid the ten employees at issue more in fringe benefits than shown by the records in evidence, such records would have been produced.

(*Id.* at 47.)

The ALJ also concluded that the regulations preclude Petitioners from counting wages paid in excess of the minimum wage toward the required health and welfare benefits. (*Id.* at 48-49 (citing 29 C.F.R. § 4.170(a) ("Fringe benefits required under the Act shall be furnished, separate from and in addition to the specified monetary wages," and "[a]n employer cannot offset an amount of monetary wages paid in excess of the wages required under the determination in order to satisfy his fringe benefit obligations under the Act, and must keep appropriate records separately showing amounts paid for wages and amounts paid for fringe benefits")).) Therefore, in the absence of any evidence of cash payments in lieu of fringe benefits, the ALJ found that the Petitioners owed $67,893.78. (*Id.* at 49.)[2]

---

[2] Relatedly, the ALJ concluded that Petitioners had failed to keep and provide appropriate records that separately show amounts paid for wages and amounts paid for fringe benefits, along with other payroll information, in violation of the SCA. (*Id.* at 51-52.) He further concluded that Petitioners violated the SCA by failing to deliver notice of the required minimum wage and fringe benefits to their service employees, on their first

Second, the ALJ found that the Petitioners could not offset the unpaid health and welfare benefits amount by Joel Holstad's $40,000 settlement amount or by a debt HUD allegedly owed Northwest Title.[3] (*Id.* at 50-51.) He found that Joel Holstad's settlement amount only covered unpaid back wages. (*Id.* at 51.) Petitioners offered no argument or evidence to the contrary. (*Id.*)

Third, the ALJ considered Petitioners' argument that the two-year statute of limitations period under the Portal-to-Portal Act, 29 U.S.C. § 255, barred the Administrator's claims and concluded that this statute did not apply to claims arising under the SCA. (*Id.* at 44-45.)

Fourth, the ALJ found that Mr. Holstad was a corporate officer, had control over Northwest Title at all relevant times, and, therefore, was a "party responsible" under the SCA. He noted that both Mr. Holstad and Joel Holstad testified that Mr. Holstad managed Northwest Title as CEO through at least August 2012. (*Id.* at 31, 38.) He also found that Mr. Holstad had "overall authority" of Northwest Title through at least August 2012. (*Id.* at 54 n.83.) Indeed, Mr. Holstad testified that he "managed the managers" at Northwest Title and was aware of what they were doing. (*Id.* at 55-57.) Further, two former Northwest Title employees testified that Mr. Holstad directly supervised their manager on matters relating to the contract. (*Id.* at 57.)

---

day of work, or to post a notice of the required compensation in a prominent place at the worksite. (*Id.* at 52-53.)

[3] The ALJ also noted that Petitioners failed to explain how this alleged HUD debt was relevant to this case. (*Id.* at 50-51.)

The ALJ acknowledged Mr. Holstad's testimony that he sold Northwest Title to Joel Holstad on December 27, 2011 and, therefore, had no responsibility for SCA violations occurring after that date. (*Id.* at 54 n.83.) However, the ALJ rejected this testimony, finding instead that no sale occurred because the evidence showed that Joel Holstad never signed the relevant purchase agreement. (*Id.* at 23, 41, 54 n.83.)

As a result, the ALJ ordered Northwest Title and Mr. Holstad to pay $67,893.78 in health and welfare benefits to ten employees. (*Id.* at 60-61.) The ALJ also debarred them from being awarded a federal government contract for three years. (*Id.* at 61.)

### D.      Proceedings Before the Administrative Review Board

Petitioners appealed the ALJ Decision to the Administrative Review Board ("ARB"). The ARB affirmed, finding that the record "supports the ALJ's findings of fact and conclusions of law." (ARB Decision at 4.) The ARB agreed that Petitioners failed to pay required health and welfare benefits. (*Id.* at 4-5.) And it rejected Petitioners' argument that wages paid in excess of the minimum wage could count toward its fringe benefit obligation because they failed to provide records showing that fringe benefits were included in employees' wages. (*Id.* at 5.)

Further, the ARB rejected Mr. Holstad's argument that he did not manage the contract and therefore was not personally liable as a "party responsible." (*Id.* at 5.) The ARB agreed with the ALJ's findings that Mr. Holstad "directed and supervised Northwest Title's performance under the HUD contract, including the labor and employment policies, and maintained sufficient control over the company and its operations." (*Id.*) Also, the

ARB rejected Mr. Holstad's argument that the ALJ's findings regarding his personal liability were based on hearsay testimony. (*Id.*)

The ARB also rejected Petitioners' argument that Joel Holstad's settlement amount and the alleged debt from HUD should offset the amount of unpaid health and welfare benefits. (*Id.* at 5-6.) Further, it determined that the two-year statute of limitations periods under the Portal-to-Portal Act and under Minnesota state law do not apply to the Administrator's claims. (*Id.* at 6.)[4] Lastly, the ARB affirmed the ALJ's order debarring Petitioners. (*Id.* at 6.)

### E. Petition for Review Before the Eighth Circuit

On July 10, 2020, Northwest Title and Mr. Holstad filed a Petition for Review in the U.S. Court of Appeals for the Eighth Circuit. (*See* Pet. for Review at 1.) Thereafter, the DOL filed a motion to dismiss for lack of subject matter jurisdiction or, in the alternative, to transfer the case to an appropriate district court. (*See* Docs. Received from U.S. Ct. of Appeals for the Eighth Circuit [Doc. No. 4] at 5-13.)[5] Northwest Title and Mr. Holstad opposed the motion. (*See id.* at 80-83.) On August 13, 2020, the Eighth Circuit transferred jurisdiction over the case to this Court. (*See id.* at 84; Jurisdiction Transferred [Doc. No. 5].)

---

[4] The ARB declined to adopt the ALJ's conclusion that the six-year statute of limitations under 28 U.S.C. § 2415(a) applied to this action, reasoning that that statute does not apply to administrative proceedings. (*Id.* at 6 n.1.)

[5] The page numbers included in this citation and the next two in-line citations refer to the PDF page numbers, rather than any of the internally labeled pagination.

### F.     The Instant Proceedings

After the transfer, Northwest Title and Mr. Holstad filed a brief and affidavit supporting their Petition for Review. (*See* Pet'r's Br. to the Dist. Ct. ("Pet'r's Br.") [Doc. No. 9]; Aff. of Wayne Holstad ("Holstad Aff.") [Doc. No. 10].) The DOL then moved to dismiss this action and, in the alternative, moved for summary judgment. (*See* Resp't's Mot. to Dismiss or, in the Alternative, for Summ. J. [Doc. No. 14]; Resp't's Resp. to Pet. for Review and Mem. in Supp. of Mot. to Dismiss or, in the Alternative, for Summ. J. ("Resp't's Mem.") [Doc. No. 15]; Starrett Aff. [Doc. No. 18].) Northwest Title and Mr. Holstad then filed a brief in opposition to the DOL's motions. (*See* Pet'r's Mem. in Opp'n to the DOL's Mot. to Dismiss or, in the Alternative, for Summ. J. ("Pet'r's Opp'n") [Doc. No. 20].) Thereafter, the DOL filed a reply brief. (*See* Resp't's Reply in Supp. of Mot. to Dismiss or, in the Alternative, for Summ. J. ("Resp't's Reply") [Doc. No. 23].)

Although the parties initially disagreed as to whether the Court has jurisdiction over this case, the parties agreed at oral argument that the Court could review the agency decisions at issue pursuant to the APA. *Accord Aune v. Adm'r, Wage & Hour Div., U.S. Dep't of Labor*, 2010 U.S. Dist. LEXIS 142352, at *57 (D.S.D. June 28, 2010) ("Because the SCA itself does not provide for federal judicial review of final agency decisions in cases arising under the SCA, the [APA] provides the sole basis for a district court's review of final agency decisions."). The Court will therefore review the decisions below pursuant to the APA.

10

## II.    DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

The APA permits reviewing courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is "highly deferential" and "narrow." *Org. for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 459 (8th Cir. 2018). Accordingly, an agency decision may be deemed arbitrary or capricious if "the agency … entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Parks Conservation Ass'n v. McCarthy*, 816 F.3d 989, 994 (8th Cir. 2016). Moreover, courts generally defer to an agency's interpretation of a regulation unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997). However, *Auer* deference is only triggered if a regulation is genuinely ambiguous. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).

A court reviewing agency action pursuant to the APA generally defers to the agency's findings of fact if "substantial evidence" supports them. 5 U.S.C. § 706(2)(E). However, because Title 41 governed the administrative proceedings below, the court applies a different standard of review when reviewing the agency's factual findings. *See* 41 U.S.C. §§ 6506-07. Under Title 41, the Secretary of Labor or his representative may "hold hearings" upon a complaint that a federal contractor has violated the law or the governing contract, and "[a]fter notice and a hearing, … shall make findings of fact." 41 U.S.C. § 6507(b), (e). "The findings are conclusive for agencies of the United States," and

"[i]f supported by a preponderance of the evidence, … are conclusive in any court of the United States." *Id.* § 6507(e).

As courts have observed, the SCA is not perfectly clear as to what precise standard of review this Court should apply. One court summed up the source of this confusion:

> In its normal iteration, the preponderance of the evidence standard, like "clear and convincing" and "beyond a reasonable doubt," establishes a quantum of proof to be measured by the factfinder, not a standard for error-detection. When used to describe appellate review, however, the phrase is at best an awkward locution, for it connotes nothing about the degree of probability of error required before a reviewing court may set aside a factual determination.

*Dantran, Inc. v. U.S. Dep't of Labor*, 171 F.3d 58, 70 (1st Cir. 1999). Recognizing this lack of clarity, courts have construed § 6507(e)'s standard of review in different ways. *See Tri-Cty. Contractors, Inc. v. Perez*, 155 F. Supp. 3d 81, 88-90 (D.D.C. 2016) (comparing different interpretations of this standard of review). For example, some courts interpret § 6507(e) as requiring district courts to review the agency's factual findings for clear error. *See, e.g.*, *Dantran, Inc.* at 70-71. In contrast, other courts have applied some form of de novo review. *See, e.g.*, *Karawia v. U.S. Dep't of Labor*, 627 F. Supp. 2d 137, 143-45 (S.D.N.Y. 2009); *accord Dantran, Inc.*, 171 F.3d at 77 (Cudahy, J., concurring in part and dissenting in part) ("If the finder of fact and the reviewing authority are bound by the same standard in establishing the facts (preponderance of the evidence), the logic of the situation is that review is essentially *de novo*."). The Eighth Circuit does not appear to have directly addressed this issue. *See Williams v. U.S. Dep't of Labor*, 697 F.2d 842, 844 (8th Cir. 1983)

(holding that a district court must accept the agency's factual findings if they are supported by a preponderance of the evidence and that the standard of review is "narrow").

However, the Court need not resolve this question because the Court would not overturn the factual findings made by the ALJ and upheld by the ARB under any standard of review. As explained below, the record evidence provides sufficient support for the ALJ's factual findings. Consequently, for purposes of its review, the Court "will assume that it reviews the [agency's] findings of fact essentially de novo in order to determine whether a preponderance of the evidence supports the agency's factual findings." *Tri-Cty. Contractors, Inc.*, 155 F. Supp. 3d at 90 (internal quotation marks and citations omitted). Of course, the Court will review the agency's conclusions of law pursuant to the APA to determine whether they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**B.   Analysis**

**1.   Payment of Health and Welfare Benefits or Their "Cash Equivalent"**

First, the Court considers Petitioners' argument that the ALJ erred in concluding that they did not provide "cash equivalent" compensation instead of fringe benefits to those employees who declined fringe benefits.

**a.   Disputed Findings of Fact**

As noted, the ALJ found that Petitioners failed to pay $67,893.78 in health and welfare fringe benefits to ten employees. (ALJ Decision at 47-49, 60-61.) Ms. Jacobson calculated the unpaid benefits due to the ten employees using $3.35 per hour during the

first year of the contract and $3.50 per hour during the second year, for the period from May 15, 2010 to May 5, 2012. (*Id.* at 46, 48.)

The ALJ found that the Petitioners failed to keep and provide records showing that they made separate "cash equivalent" payments instead of providing fringe benefits. (*Id.* at 50.) However, Petitioners contend that they did in fact pay "cash equivalent" payments in lieu of health and welfare benefits, but that evidence of those calculations no longer exists. (*See* Pet'r's Opp'n at 6.) In the absence of any evidence to support Petitioners' claim, the Court agrees with the ALJ's finding that Petitioners failed to meet their burden of proof as to any "cash equivalent" payments made in lieu of health and welfare benefits.

Next, Petitioners dispute the ALJ's finding that Northwest Title did not have a company policy of paying higher wages in lieu of health and welfare benefits to employees who declined those benefits. In support, they point to Mr. Holstad's testimony that such a policy existed. (Pet'r's Opp'n at 12-13.) The ALJ, however, declined to accept this testimony and instead found Ms. Jacobson's testimony more credible that, based on all of the records Petitioners provided her, there was no such company policy. (*See* ALJ Decision at 46-48; *see also id.* at 47 (noting Joel Holstad's testimony that, to the extent he had health and welfare benefit records, they were provided to Ms. Jacobson).) Indeed, Petitioners point to no evidence of the existence of such a company policy, and Mr. Holstad even testified that this alleged policy was not "rigid" and that he left decisions regarding whether to raise a wage based on an employee's declination of benefits "entirely within" the discretion of one of his employees. (*Id.* at 40.)

### b.      Disputed Conclusions of Law

Petitioners contend that the ALJ and ARB erred in concluding, as a matter of law, that Petitioners failed to make "cash equivalent" benefit payments for two reasons. First, they argue that they complied with the law by merely paying their employees amounts exceeding the sum of the required minimum wage and required health and welfare benefits. (Pet'r's Opp'n at 20-21). Second, they argue that any regulation requiring that "cash equivalent" payments be made separate from wages cannot be enforced against them because they had no prior notice of it. (*Id.* at 21-23.)

The Court disagrees with Petitioners on both fronts. First, the law unambiguously required them to make "cash equivalent" benefit payments separate from wages. The SCA allows contractors to fulfill their fringe benefit obligation by making "equivalent or differential payments in cash under regulations established by the Secretary." 41 U.S.C. § 6703(2). Under the regulations, contractors must provide fringe benefits "separate from and in addition to the specified monetary wages." 29 C.F.R. § 4.170(a). And "[a]n employer cannot offset an amount of monetary wages paid in excess of the wages required under the [wage] determination in order to satisfy his fringe benefit obligations under the Act, and must keep appropriate records separately showing amounts paid for wages and amounts paid for fringe benefits." *Id.* Consequently, as the ALJ and ARB concluded, Petitioners cannot simply use wages paid in excess of the required minimum wage to satisfy their fringe benefit obligation.

Second, Petitioners had notice of these requirements. The relevant regulations have been in place for years. *See* Service Contract Act; Labor Standards for Federal Service

16

Contracts, 48 Fed. Reg. 49736, 49792 (Oct. 27, 1983) (to be codified at 29 C.F.R. § 4.170). And the DOL has enforced these regulations for years. *See, e.g.*, *In re United Kleenist Org.*, No. 00-042, 2002 WL 181779, at *5-7 (ARB Jan. 25, 2002). There is simply no basis for Petitioners' argument that they had no notice of the regulations.

For those reasons, Petitioners' citations to *Hennepin Cty. Medical Ctr. v. Shalala*, 81 F.3d 743 (8th Cir. 1996), and *Shalala v. St. Paul-Ramsey Cty. Medical Ctr.*, 50 F.3d 522 (8th Cir. 1995), are inapposite. (*See* Pet'r's Opp'n at 21-23.) As Petitioners note, these cases reaffirm the general rule that an agency cannot impose requirements that extend beyond statutory or regulatory language without providing notice of the new requirements. *See Hennepin Cty. Medical Ctr.*, 81 F.3d at 748; *St. Paul-Ramsey Cty. Medical Ctr.*, 50 F.3d at 528. But here, Petitioners had decades of notice. And ignorance of the regulatory requirements is no excuse for noncompliance. *See United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 563 (1971) ("The principle that ignorance of the law is no defense applies whether the law be a statute or a duly promulgated and published regulation."). For all the above reasons, the ALJ's and ARB's legal conclusions were not arbitrary and capricious.

### 2.    Alleged Offsets to Unpaid Health and Welfare Benefits Due

Next, Petitioners contend that the ALJ and ARB erred when they declined to offset Joel Holstad's settlement amount and a debt allegedly owed to Northwest Title by HUD against the unpaid fringe benefit amount. (Pet'r's Opp'n at 7-12.) In response, the DOL argues that the ALJ and ARB correctly declined to make these offsets because: (1) Joel Holstad's settlement amount only covered unpaid back wages, not unpaid health and

welfare fringe benefits; and (2) Petitioners offered no evidence of any debt owed by HUD, and even if they could, the relevance of that debt to this case. (DOL Reply at 9-11.)

The Court agrees with the DOL. First, the evidence shows that the funds that Joel Holstad paid as part of his settlement were an offset to back wages only. (*See* ALJ Decision at 51.) Second, any funds HUD may owe to Northwest Title are simply irrelevant to this action.

### 3.    Statute of Limitations

Next, Petitioners argue that the ALJ and ARB erred by failing to apply the two-year statute of limitations periods under Minnesota law, Minn. Stat. § 541.07(5), and the Portal-to-Portal Act, 29 U.S.C. § 255. (Pet'r's Br. at 22-29; Pet'r's Opp'n at 23-25.) Minn. Stat. § 541.07(5) imposes a two-year statute of limitations period on actions "for the recovery of wages." The Portal-to-Portal Act imposes a two-year statute of limitations period on certain actions under the Fair Labor Standards Act of 1938, the Walsh-Healey Act, and the Davis-Bacon Act. *See* 29 U.S.C. § 255. The SCA itself does not expressly include a statute of limitations period. *See* 29 C.F.R. § 4.187(c).

The ARB correctly declined to apply the statute of limitations periods under Minn. Stat. § 541.07(5) and 29 U.S.C. § 255. First, the Minnesota statute cannot bar this action because, when the United States sues to enforce federal law, state statute of limitations periods do not bind it. *See United States v. Summerlin*, 310 U.S. 414, 416 (1940) ("It is well settled that the United States is not bound by state statutes of limitation … in enforcing its rights." (citations omitted)). Second, the Portal-to-Portal Act does not apply to SCA cases because the Portal-to-Portal Act does not list the SCA among the acts to which it

applies. *See* 29 U.S.C. § 255; 29 C.F.R. § 4.187(c); *cf. United States v. Deluxe Cleaners & Laundry*, 511 F.2d 926, 927-28 (4th Cir. 1975) (holding that the statute of limitations in the Portal-to-Portal Act does not apply to actions under the SCA and noting that "the United States is not bound by any statute of limitations unless Congress explicitly directs otherwise").

### 4.    Personal Liability as a "Party Responsible"

Finally, Mr. Holstad contends that the ALJ and ARB erred in finding him personally liable because he is not a "party responsible" under the SCA. (Pet'r's Opp'n at 25-31.) Under the SCA, a "party responsible" for certain SCA violations is liable for the "underpayment of compensation due any employee engaged in the performance of the contract." 41 U.S.C. § 6705(a). Parties responsible include corporate officers "who actively direct[] and supervise[] the contract performance" and "corporate officers who control, or are responsible for control of, the corporate entity, as they, individually, have an obligation to assure compliance with the requirements of the Act, the regulations, and the contracts." 29 C.F.R. § 4.187(e)(1)-(2). A party responsible is subject to personal liability. *See id.*

Here, Mr. Holstad contends that the ALJ erred in making the following findings of fact: (1) that Mr. Holstad managed Northwest Title at all relevant times; and (2) that Mr. Holstad did not sell the firm to Joel Holstad. (Pet'r's Br. at 29-35; Pet'r's Opp'n at 3-5, 17-18.) In response, the DOL argues that the record is replete with evidence showing Mr. Holstad's control over Northwest Title. (DOL Reply at 15-17.) The DOL further argues that the ALJ correctly found that Mr. Holstad did not sell Northwest Title to Joel Holstad

because Mr. Holstad failed to produce any evidence showing that such a sale occurred. (*Id.* at 14-15.)

The Court agrees with the DOL. First, there is ample evidence in the record showing that Mr. Holstad managed Northwest Title at all relevant times. Mr. Holstad himself testified that he served as CEO of Northwest Title through at least August 2012. (*See* Starrett Aff. [Doc. No. 18-7] at 13.) He also testified that he was the "manager of the managers," and that he was "aware of the things [his] managers were doing," (*Id.* at 61-63.) Second, there is insufficient evidence that Mr. Holstad sold Northwest Title to Joel Holstad. Although Mr. Holstad produced a purchase agreement, it only bears Mr. Holstad's signature—Joel Holstad did not sign it. Mr. Holstad points to no evidence showing that this sale was actually consummated. Indeed, as the ALJ found, the record evidence shows that Mr. Holstad was the sole owner and shareholder of the firm through at least August of 2012.

Next, Mr. Holstad contends that the ALJ and ARB erred because, in his view, he cannot be a "party responsible" because he only "managed the managers" and did not manage the HUD contract. However, personal liability as a "party responsible" extends to corporate officers who actively direct and supervise contract performance and corporate officers "who control, or are responsible for control of, the corporate entity." *See* 29 C.F.R. § 4.187(e)(1)-(2). As the ALJ described in detail, the record evidence shows that Mr. Holstad had sufficient control over the firm as a corporate officer to qualify as a "party responsible." (*See* ALJ Decision at 53-58.)

Finally, Mr. Holstad contends that the ALJ's conclusion that he was a "party responsible" should be overturned because the ALJ solely relied on anonymous hearsay testimony from Ms. Jacobson that Mr. Holstad was the CEO and sole owner of Northwest Title. (Pet'r's Br. at 34-35; Pet'r's Opp'n at 18-19.) In response, the DOL argues that, in addition to Ms. Jacobson's testimony, the ALJ reached this conclusion based on various other testimonial and documentary evidence. (DOL Reply at 16-17.) It also contends that Ms. Jacobson's testimony was not hearsay because the statements at issue were those of Joel Holstad, a party opponent. (*Id.*)

The Court agrees with the DOL. The ALJ did not solely rely on Ms. Jacobson's testimony—he relied on the testimony of Mr. Holstad, Joel Holstad, and two former employees of Northwest Title, as well as documentary evidence showing Mr. Holstad's control over Northwest Title. (*See* ALJ Decision at 54-58.) Further, Ms. Jacobson's testimony as to Joel Holstad's statements are plainly admissions by a party opponent, and the ALJ did not abuse his discretion in admitting them. *See* 29 C.F.R. § 18.801(d)(2)(i); *Mercier v. U.S. Dep't of Labor, Admin. Rev. Bd.*, 850 F.3d 382, 388-90 (8th Cir. 2017) (applying abuse-of-discretion standard in upholding ALJ's ruling on hearsay objection).[6]

---

[6] Although the Federal Rules of Evidence do not apply in administrative hearings, the DOL's regulations on the admission of hearsay evidence are similar to the federal rules. *See Mercier*, 850 F.3d at 389 n.2 (citing 29 C.F.R. §§ 18.801-18.806).

Moreover, because the Court concludes that the ALJ and ARB did not err in concluding that Mr. Holstad is a "party responsible" under the SCA, it need not address Mr. Holstad's argument that "piercing the corporate veil" is the only way he could face personal liability in this case. (*See* Pet'r's Br. at 33-34.)

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Petitioners' Petition for Review [Doc. No. 1] is **DENIED**; and

2. Respondent's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. No. 14] is **DENIED** to the extent it moves to dismiss and is **GRANTED** to the extent it moves for summary judgment.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 30, 2021                              s/Susan Richard Nelson
                                                  SUSAN RICHARD NELSON
                                                  United States District Judge